**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| REGINALD HATCHER,<br><br>                       Plaintiff,<br><br>                         v.<br><br>ROBERT L. WILKIE, JR.,<br>Secretary, Department of Veterans Affairs,<br><br>                       Defendant. | )<br>)<br>)<br>)<br>)     Case No. 1:16-cv-00587-TWP-MJD<br>)<br>)<br>)<br>)<br>)<br>) |

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendant Robert L. Wilkie, Jr.,[1] Secretary of the U.S. Department of Veterans Affairs ("the VA") ("the Secretary") ([Filing No. 51](#)).  Plaintiff Reginald Hatcher ("Hatcher") was terminated from his employment after a tumultuous, year-long stint working as a housekeeping aide in the VA's environmental management services department. Following his termination, Hatcher filed this action asserting claims for racial and sexual harassment, race discrimination, and retaliation.  The Secretary filed a Motion for Summary Judgment, arguing there is insufficient evidence to support any of Hatcher's claims.  For the following reasons, the Court **grants in part and denies in part** The Secretary's Motion for Summary Judgment.

## I.  BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Hatcher as the non-moving

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Robert L. Wilkie, Jr., the current Secretary of Veterans Affairs, is automatically substituted for Robert A. McDonald, the former Secretary of Veterans Affairs, who is the originally named defendant in this case.

party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Hatcher, an African-American male, began working for the VA as a housekeeping aide in the Environmental Management Services department ("EMS") on January 26, 2014, at the Richard L. Roudebush VA Medical Center (the "Hospital") in Indianapolis, Indiana (Filing No. 51-7). Hatcher's employment was subject to a one-year probationary period, during which time he had to demonstrate that he fit the qualifications of the position (Filing No. 51-7; Filing No. 51-2 at 19–20). This probationary period allows the VA an opportunity to review an employee's work, conduct, and performance to determine whether he should be retained and become a permanent part of the federal service (Filing No. 51-2 at 20).

EMS is responsible for keeping the Hospital clean and sanitary (Filing No. 51-1 at 1–2). During the relevant time period, Toya Crain ("Crain") was the Chief of EMS, and Sylvia Clark ("Clark") was the Assistant Chief of EMS (Filing No. 51-3 at 19, 28). Crain is African-American, and EMS was predominantly composed of African-American supervisors and employees. *Id.* at 14–15. EMS supervisors worked under the direction of Crain and Clark, and work leaders worked under the direction of the supervisors. *Id.* at 78. Work leaders were responsible for monitoring EMS housekeeping aides to make sure they were in their assigned areas and accomplishing their assigned tasks (Filing No. 51-4 at 1).

When Hatcher began working in January 2014, his supervisor was La'Gail Sanford ("Sanford"), an African-American female. Less than a month after Hatcher started his employment, Sanford asked him if he was single and told him that he was good looking. She explained to Hatcher that she had lost her husband, had not had sex in a long time, and wanted to have sex with him. Additionally, Hatcher had a medical condition that was treated by Caucasian

female doctors at the Hospital, and occasionally Hatcher would see his doctors while he was working and stop to converse with them. On one occasion, Sanford saw Hatcher talking with one of his doctors, and Sanford told him that he "better quit 'fucking' with those white girls. [He] was just like those other 'niggers'. If [he] did not stop [he] was going to get fired." ([Filing No. 61-1 at 3](); [Filing No. 51-6 at 38]()–42.) Soon after this incident, Sanford called Hatcher into her office. "She told me 'to get my ass in here and close the door'. She then told me 'to quit fucking with those white girls, I am going to fire your ass'." *Id.*

Hatcher complained about these incidents to EMS Assistant Chief Clark, and soon thereafter, Hatcher was transferred to the second shift and fell under the supervision of EMS supervisor Ethan Hughes ("Hughes") and work leader Frank Viers ("Viers") ([Filing No. 61-1 at 3]()). The harassment from Sanford stopped after Hatcher was transferred to Hughes' supervision ([Filing No. 51-6 at 86]()–87).

On April 11, 2014, a patient reported that a housekeeper was sleeping in his room on the other side of the curtain. The housekeeper had asked the patient not to tell anyone and to just wake him up if the patient heard anybody coming. Hatcher was found asleep in the patient's room behind the curtain ([Filing No. 51-1 at 7](), 2). An EMS supervisor issued written counseling to Hatcher dated May 1, 2014, but because Hatcher was off work from May 3, 2014 to July 28, 2014, this written counseling was not given to him until August 18, 2014. *Id.* at 2, 5–6.

Soon after Hatcher was transferred to the second shift under Hughes' supervision, John Robertson ("Robertson"), another EMS supervisor, approached Hatcher and told him that Hughes was racist and did not like Black people, so Hatcher should not work under Hughes' supervision. Robertson is African-American, and Hughes is Caucasian. Robertson tried to convince Hatcher not to work under Hughes, but Hatcher continued to work under Hughes' supervision and had a

good working relationship with him without incident. Robertson told Hatcher that he was an "Uncle Tom" for working under Hughes ([Filing No. 61-1 at 3](#)–4).

The work leader under Robertson was Walter White ("White"), who also is African-American. After Robertson was unsuccessful in convincing Hatcher to work under his supervision instead of under Hughes, White or Robertson would call Hatcher "Uncle Tom" or "Uncle Tom Nigger" on a daily basis. Not only did White call Hatcher these racially derogatory names, but he also incessantly followed and monitored Hatcher even though he was not Hatcher's work leader or supervisor. Hatcher complained to Hughes about Robertson and White calling him derogatory names and monitoring him, but this complaint was unavailing as White continued to call Hatcher "Uncle Tom" or "Uncle Tom Nigger" and constantly monitored him ([Filing No. 61-1 at 4](#)). The situation was so bad that Hughes tried to arrange Hatcher's work assignments so that he could avoid any contact with Robertson and White ([Filing No. 61-8 at 4](#)).

Because the incessant monitoring and racially derogatory name calling continued, Hatcher complained to Assistant Chief Clark in September 2014. He explained to Clark that Robertson and White told him that Hughes was racist and he should not work for Hughes. Hatcher also explained to Clark that they were calling him racially derogatory names and constantly monitoring him. Clark reported Hatcher's complaint to EMS Chief Crain. Clark did not investigate the complaint because she expected Crain to investigate and address it ([Filing No. 61-9 at 3](#)–4).

Crain acknowledged that Clark reported the complaint of harassment to her in October 2014, but she did not undertake any investigation because she believed that Clark would take care of it ([Filing No. 61-3 at 2](#)). Hatcher and Hughes continued to complain to Clark about the ongoing racial slurs and excessive monitoring, and Clark reported the complaints to Crain ([Filing No. 61-9 at 4](#)).

Because of the ongoing problem, Hughes scheduled a meeting with the other second shift EMS supervisors—Robertson and Stephen Perroni ("Perroni")—on October 15, 2014.  During this meeting, Hatcher complained to the three supervisors about being called racially derogatory names and being excessively monitored (Filing No. 61-1 at 4–5).  In trying to explain the level of frustration and stress that he was experiencing from White's ongoing harassment, Hatcher stated that "if he were on the street, he would kill Mr. White." (Filing No. 61-8 at 4.)  Hatcher also stated, "I'm a killer," and indicated that he did not want to be in the same situation as his brother who went to jail for murdering someone in the same kind of situation (Filing No. 51-1 at 8).  Hatcher subsequently clarified his comments and explained that he did not intend to harm White but was trying to show his level of frustration (Filing No. 61-8 at 4; Filing No. 51-1 at 8).  At the meeting, it was agreed upon that White would have no contact with Hatcher, yet Hatcher continued to complain that he was being harassed thereafter (Filing No. 61-8 at 4).  After the meeting, all three supervisors submitted statements about the meeting and Hatcher's remarks (Filing No. 51-1 at 8–10).  Hughes also contacted Assistant Chief Clark, and she directed Hughes to contact the VA police, which he did.  *Id.* at 8, 11–12.

About two weeks later, on November 3, 2014, EMS Chief Crain met with Hatcher, Hughes, and Clark.  At this meeting, Crain issued a termination letter to Hughes that was dated October 31, 2014, and explained that he was being terminated effective November 15, 2014.  During the meeting, Hatcher explained that he had been and was being harassed by White, Robertson, and Perroni.  Hughes and Clark both vouched for Hatcher and reminded Crain of the prior complaints of harassment.  Crain explained that she had not undertaken any investigation of the complaints. She thought Clark was going to take care of it (Filing No. 51-13; Filing No. 51-14; Filing No. 61-9).

The termination letter issued to Hatcher explained,

> You are being terminated from your position for failure to qualify during your trial/probationary period. Specifically, your termination is due to your use of inappropriate language, for example you said, "If I was on the street I would kill him," in regards to [a] work leader. Also, you received a Written Counseling in August 2014; specifically, it was reported that you asked a patient to wake you if the patient "heard anyone coming." Therefore, it has been determined that your retention is not in the best interest of the Federal Government.

(Filing No. 51-14 at 1.)

After Hatcher complained about the ongoing incidents of harassment during the November 3, 2014 meeting with Crain, an investigation was commenced that involved the VA's equal employment opportunity office ("EEO") (Filing No. 51-8). On November 4, 2014, Hatcher met with Lynn Medley ("Medley") and Dwight Harwell of the EEO. They interviewed Hatcher for two hours about the various incidents of harassment. Medley concluded, "For the purpose of this interview and review of the [reports of contact] submitted I would be inclined to agree that [Hatcher] has been harassed. However, if EMS management feels that his behavior during his probationary period warrants termination, they should move forward with it." (Filing No. 51-15 at 4–5.) Medley recommended that, in the future, supervisors should consult with the EEO, human resources, and the department chief before initiating a plan of action to address harassment. She further recommended that periodic follow-up be conducted to ensure that harassment has ceased, that mandatory communication training and team building training be provided, and all EEO laws and regulations must be followed. *Id.* at 5.

Medley's findings and recommendations were provided to Crain, who shared them with human resources and the assistant director of the Hospital on November 10, 2014. *Id.* at 6. The assistant director of the Hospital instructed that Hatcher's termination be put on hold to allow further investigation of his harassment claims (Filing No. 51-1 at 3). The assistant director of the

Hospital also issued written counseling to all the EMS supervisors as well as to Crain and Clark. The written counseling directed that the use of profanity, abusive language, and derogatory language must stop immediately. Unprofessional behavior such as pointing fingers at employees while giving guidance also was to stop immediately. The written counseling also noted that mandatory communication and team building training was going to be held within the EMS department. *Id.* at 4, 17–25.

On November 14, 2014, Hatcher's termination was rescinded. He was reminded that inappropriate language and conduct would not be tolerated, and he also was reminded that he was still working within his probationary period. (Filing No. 51-16.)

In late December 2014, Hatcher was assigned to work on the second floor to remove trash. On December 28, 2014, he went to the second floor radiology department and knocked on the door. A Caucasian female named Dana opened the door. Hatcher told Dana that he was there to pick up the trash and linens, but Dana shouted at him that there was no trash and closed the door in his face. Hatcher reported the incident to Hughes. (Filing No. 61-1 at 5–6; Filing No. 51-18.) Hughes then went to the second floor radiology department and told Dana that Hatcher's job was to pick up the trash. However, Dana was rude to Hughes and still would not allow Hatcher to pick up the trash. (Filing No. 61-8 at 5.) Hughes reported this to his supervisor, who went to Dana's office to discuss the matter. Dana still refused to allow Hatcher to collect the trash, and when Hughes' supervisor told him about this, he made a gesture to Hughes that suggested Dana had a problem with African-Americans. *Id.*

During this same time frame, other female staff in the radiology department on the second floor complained that they felt uncomfortable and nervous around Hatcher. He was found by staff in secured areas and gave them different excuses for why he was there. They alleged that Hatcher

made sexual comments to them and starred at them, which made them feel uncomfortable. ([Filing No. 51-19 at 4](#)–5.)

On December 30, 2014, Crain, Medley, a human resources specialist, and the chief of the radiology department held a meeting to discuss the allegations that Hatcher was making female staff in radiology feel uncomfortable. They decided during the meeting that the allegations warranted a fact-finding investigation and that Hatcher should be moved from his second floor assignment to a different assignment. ([Filing No. 51-15 at 2](#); [Filing No. 51-3 at 56](#)–62.)

After the meeting, Crain sent an email on December 30, 2014 to the EMS supervisors and others. The email explained,

> Mr. Hatcher is NOT to be assigned to the 2nd floor during his tour until further notice. He can work the units or a different area away from the second floor. If he is found out of his assigned area and/or on this floor staff are advised to contact the police and/or EMS supervisor . . . .

([Filing No. 51-15 at 7](#).)

The following day, Medley sent an email to the human resources specialist and explained that Hughes had provided a copy of Crain's email to Hatcher, and "[u]pon receipt, Mr. Hatcher is threatening to contact his lawyer and feels that he is being harassed by Toya [Crain]." *Id.* The email further explained, "it is extremely important for [the radiology] staff to give us concrete examples of Mr. Hatcher's behavior which [is] causing them to feel uncomfortable. If not, it will be very difficult to substantiate taking [him] off of his second floor assignment." *Id.* Medley sent a similar email to the chief of the radiology department, explaining the importance of providing concrete examples of Hatcher's conduct to justify the decision to remove him from the second floor assignment. *Id.* at 8. Crain did not receive any formal complaints about Hatcher, ([Filing No. 51-3 at 63](#)), and the human resources specialist could not recall receiving any substantiating documentation ([Filing No. 51-20 at 3](#)).

On January 5, 2015, while Crain was on vacation, William Jerome, the acting chief of EMS, sent an email rescinding Crain's December 30, 2014, email. His email noted, "Team, there was miscommunication in the previous message regarding Mr. Hatcher's work assignment, and notification of areas worked. Please consider the e-mail rescinded." (Filing No. 51-22.)

The director of the Hospital issued two letters to Hatcher on January 21, 2015. In one letter the director stated he was aware of Hatcher's allegations of harassment, and the investigation of the harassment was completed and the concerns had been and were then being addressed (Filing No. 51-23). The other letter informed Hatcher that his employment was being terminated effective January 24, 2015 (Filing No. 51-24). The letter explained that his termination was based on the same reasons noted in the October 31, 2014 termination letter.

> [Y]our termination is due to your use of inappropriate language, for example you said, "If I was on the street I would kill him," in regards to a work leader. Also, you received a Written Counseling in August 2014; specifically, it was reported that you asked a patient to wake you if the patient "heard anyone coming." Therefore, it has been determined that your retention is not in the best interest of the Federal Government.

*Id.*

Hatcher first contacted an EEO counselor on November 10, 2014, to complain about the harassment he was experiencing. (Filing No. 51-25 at 1; Filing No. 51-6 at 157–58.) This initial contact with an EEO counselor occurred seven days after Hatcher was given the October 31, 2014 termination letter. Four days after Hatcher's initial contact with the EEO counselor, on November 14, the Hospital rescinded the October 31, 2014 termination letter.

Following his termination, Hatcher filed a formal complaint of employment discrimination with the VA on February 5, 2015. (Filing No. 51-26; Filing No. 51-6 at 158.) In the formal complaint, Hatcher identified age, race, and reprisal as the bases for the discrimination claims. He described his claims as a "hostile work environment" and "harassment from Walter White, John

Robertson, Steve Perroni, LaToya Crain, and X-ray Tech Dana." (Filing No. 51-26.) He further described his claims as an "unlawful termination based on lies from Perroni and Robertson and lie about sleeping on duty . . . ." *Id.* Hatcher noted in his formal complaint that he had complained to Hughes, Viers, Clark, Robertson, and Perroni, and he initially contacted an EEO counselor in "maybe Dec. 2014." *Id.*

On March 4, 2015, Hatcher received a "Notice of Acceptance" of his EEO complaint (Filing No. 51-27). The notice set forth six acts of alleged harassment or discrimination, establishing the nature of Hatcher's claims:

1. On April 11, 2014, he was accused of sleeping on duty.
2. Beginning October 2014 through November 2014, Walter White, Team Leader, constantly harassed him.
3. On October 31, 2014, he received a letter terminating him from employment which was later rescinded on November 14, 2014.
4. On December 28, 2014, while attempting to perform his housekeeping duties, Dana (last name unknown) slammed the door in his face and told him that there was no trash or linens that needed to be picked up; and if he came back, she would write him up for stalking and harassment.
5. During January 2015, an email was distributed among staff stating, "If he was seen to call the VA police because someone had accused him of sexual assault".
6. On January 24, 2015, he was terminated from employment during his probationary period.

*Id.* at 1–2 (footnote omitted). The final agency decision on Hatcher's claims was issued on January 29, 2016, and Hatcher filed his Complaint in this Court on March 16, 2016 (Filing No. 1 at 1, ¶ 2; Filing No. 11 at 1, ¶ 2). The Secretary seeks summary judgment on all of Hatcher's claims.

## II.  SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 106 S.Ct. 1348 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

The Court views the designated evidence in the light most favorable to Hatcher, as the non-moving party, and draws all reasonable inferences in his favor. *Bright v. CCA*, 2013 U.S. Dist.

LEXIS 162264, at *8 (S.D. Ind. Nov. 14, 2013). "However, employment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes." *Id.* at *8–9 (citation and quotation marks omitted).

### III.  DISCUSSION

The Secretary argues that summary judgment is appropriate on Hatcher's claims of racial and sexual harassment, race discrimination, and retaliation because there is insufficient evidence to support the claims. The Secretary also argues that the sexual harassment claim fails as a matter of law because Hatcher did not first exhaust his administrative remedies to be able to bring the claim in a lawsuit. The Court will address each claim in turn.

### A.  Sexual Harassment Claim

Federal employees who assert Title VII claims must first timely exhaust the administrative remedies available to them before they may assert their claims in a lawsuit. *Ester v. Principi*, 250 F.3d 1068, 1071 (7th Cir. 2001). Federal employees who have experienced unlawful conduct must contact an EEO counselor within forty-five days of the conduct. 29 C.F.R. § 1614.105(a). If informal resolution is not accomplished, the federal employee must file a formal complaint with the agency.

Hatcher's sexual harassment claim is based on Sanford's actions that occurred less than a month after Hatcher began his employment on January 26, 2014; thus, the offending conduct occurred in February or March 2014. The undisputed evidence shows that Hatcher first contacted an EEO counselor on November 10, 2014 (Filing No. 51-25 at 1; Filing No. 51-6 at 157–58). Hatcher's initial contact with the EEO counselor was well beyond the forty-five day deadline for raising the issue of Sanford's harassment.

Importantly, Hatcher's formal complaint to the EEO mentioned nothing about Sanford and her improper actions toward him. (Filing No. 51-26.) In fact, the formal complaint that Hatcher submitted stated nothing on the basis of sex; rather, it noted only age, race, and reprisal. *Id.* Additionally, the EEO "Notice of Acceptance" of the formal complaint included nothing about Sanford and her conduct. (Filing No. 51-27.) "In Title VII cases, the scope of the complaint brought before the administrative agency limits the scope of subsequent civil proceedings in federal court; in other words, plaintiffs may pursue only those claims that could reasonably be expected to grow out of the administrative charges." *Reynolds v. Tangherlini*, 737 F.3d 1093, 1099–1100 (7th Cir. 2013).

Based upon these rules of administrative exhaustion and the procedural facts of this case, the sexual harassment claim must be dismissed. Rather than addressing the obstacle of a failure to exhaust administrative remedies, Hatcher simply responded with an argument of how he believes his sexual harassment claim substantively has merit. With no pertinent response from Hatcher, and with the law and the undisputed material facts in favor of the Secretary, the Court **grants** summary judgment to the Secretary on Hatcher's sexual harassment claim.

## B.  <u>Retaliation Claim</u>

To support a Title VII retaliation claim, a plaintiff must provide evidence that "(1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse action; and (3) a causal connection exists between the two." *Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 306 (7th Cir. 2012). Alternatively, under the indirect, burden-shifting approach, a plaintiff may establish a *prima facie* case of retaliation by showing: (1) he engaged in a statutorily protected activity; (2) he satisfactorily met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than a similarly situated employee who

did not engage in the statutorily protected activity.  *Id.* at 309.  If the plaintiff establishes a *prima facie* case of retaliation, the defendant must articulate a non-discriminatory reason for the adverse employment action.  If the defendant establishes such a reason, the plaintiff must show a genuine issue of material fact regarding whether the defendant's proffered reason is pretextual.  *Id.*

Hatcher argues that he engaged in protected activity when he complained several times to Hughes, Viers, and Clark that he was being called racially derogatory names by White and Robertson.  He also engaged in protected activity when he complained to the EEO counselor and filed his EEO complaint, stating that he was being harassed by White and Robertson.  He contends that he suffered an adverse employment action when he was terminated on October 31, 2014 (which was rescinded), and when he was again terminated on January 21, 2015.

Concerning the causal connection between the protected activity and the adverse employment action, Hatcher argues that "the grossly late investigation of Mr. Hatcher's complaints of harassment" is "[p]roof that Mr. Hatcher was retaliated against."  (Filing No. 60 at 25.)  Hatcher argues that Robertson, Clark, Crain, and others were issued written counseling for various misconduct, including retaliating against an employee for making complaints of harassment, pointing to the November 21, 2014 Memorandum regarding Written Counseling.  (Filing No. 61-3 at 7.[2])  Hatcher also argues that a proper understanding of the context of his comment—that he would kill White if he was on the street—leads to the conclusion that management did not do anything about the harassment.  He was simply expressing the level of his frustration with the harassment, and he intended no harm.  But, he asserts, they ignored his complaint.  If the supervisors and management thought the statement truly was threatening, Hatcher argues, they

---

[2] The designated evidence does not support Hatcher's assertion that EMS management was issued written counseling for retaliating against an employee. The written counseling does not state that EMS management did retaliate against an employee. Rather, it states that any retaliation would not be tolerated.  (Filing No. 61-3 at 7, ¶ 3.)

would have escorted him off the premises. However, he was never escorted off the premises and was allowed to continue working there for three and a half more months after the statement was made.

The Secretary responds that after the VA issued the first termination letter to Hatcher, they learned that no investigation had been conducted into Hatcher's earlier complaints to his supervisors about the harassment; the termination was put on hold so that an investigation could be conducted. The Secretary asserts that if the October 2014 termination was in retaliation for complaining about harassment, then it was illogical to rescind the termination to conduct an investigation into the harassment. Additionally, the VA issued written counseling to Robertson for his harassing conduct. The Secretary argues that Hatcher was a probationary employee subject to the employer's broad discretion, and the VA determined Hatcher was not a good fit for continued employment because of the April 2014 incident of sleeping in a patient's room and the October 2014 threat to kill White, which the VA took seriously regardless of Hatcher's later explanation about the comment.

The designated evidence indicates that there is not a causal connection between Hatcher's protected activity (complaints of harassment) and his termination. The VA terminated Hatcher's probationary employment for two reasons: first, because he slept in a patient's room and asked the patient to wake him up if somebody came to the room. He was given written counseling for this April 2014 incident in August 2014, and the delay in giving him the written counseling was attributable to Hatcher being off work from May 3, 2014, to July 28, 2014. Second, he was terminated because of his threatening statement that he would kill White if he was on the street.

Hatcher's argument is unavailing that the "context" of his threatening statement supports his retaliation claim. While Hatcher subsequently explained that he meant no harm, his own view

of his statement has no bearing on the VA's view of the threatening statement and the VA's rationale for terminating Hatcher. The evidence undisputedly shows that the VA took Hatcher's threatening statement seriously. Though they did not immediately escort him off the premises, all three supervisors filed written reports about the statement, and Hughes contacted the VA police who addressed the matter by conducting their own investigation. Hatcher's personal view of his statement does not change the fact that the VA thought his threatening statement made him unsuited to continue employment with the VA. This was coupled with the misconduct of sleeping in a patient's room.

The timing of events dispels any notion that there is a causal connection between Hatcher's complaints of harassment and his termination. On October 15, 2014, Hatcher met with the three second shift supervisors and made the threatening comment. Approximately two weeks later, on November 3, 2014, Crain met with Hatcher and gave him the October 31, 2014 termination letter from the director of the Hospital. The letter noted his termination was for the threat made two weeks earlier and the incident of sleeping in a patient's room. At this November 3, 2014 meeting, Hatcher complained of the harassment he experienced.[3]

An investigation into the harassment began, and on November 4, 2014, Hatcher met with Medley and Harwell of the EEO, who interviewed Hatcher about the harassment. On November 10, 2014, Hatcher made his first contact with an EEO counselor to complain about the harassment. Also on November 10, 2014, Medley's findings and recommendations were provided to Crain, who shared them with human resources and the assistant director of the Hospital. Then on November 14, 2014, Hatcher's termination was rescinded.

---

[3] While Hatcher raised earlier concerns of harassment to Clark, Hughes, and Viers, there is no evidence that suggests these individuals were the decision-makers for Hatcher's termination or that they influenced the decision.

On January 21, 2015, the director of the Hospital issued two letters to Hatcher, one explaining that the harassment investigation was finished and the concerns had been and were being addressed, and the other letter explaining that Hatcher's employment was terminated based on the threatening statement and the incident of sleeping in a patient's room. Hatcher then filed a formal complaint of employment discrimination with the VA on February 5, 2015. This subsequent formal complaint cannot serve as a basis for a retaliation claim for the earlier January 2015 termination.

The timing of events shows that Hatcher was indeed terminated for his threatening statement and sleeping in a patient's room. When the issue of harassment was raised with the employment decision-makers, Hatcher's termination was delayed and rescinded to allow for an investigation into the harassment. If the VA was retaliating against Hatcher for complaining about harassment, the first termination would not have been rescinded. Once the harassment investigation was complete, the director of the Hospital terminated Hatcher's employment because he was not fit for federal employment based on his threatening statement and sleeping in a patient's room. There is no evidence of other statements or conduct that supports a causal connection between Hatcher's protected activity and his termination. Hatcher's speculation and conjecture about a causal connection cannot defeat summary judgment. *Dorsey*, 507 F.3d at 627; *Sink*, 900 F. Supp. at 1072. Therefore, as a matter of law, Hatcher's retaliation claim fails, and summary judgment is **granted** on this claim.

C.  **Race Discrimination Claim**

The Secretary and Hatcher agree that the issue in a race discrimination case is whether the evidence would permit a reasonable fact finder to conclude that the plaintiff's race caused the termination or other adverse employment action. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765

(7th Cir. 2016).  The evidence must be considered as a whole instead of asking whether any piece of evidence proves the claim by itself.  *Id.*

Hatcher argues that his race discrimination claim is supported by statements from Crain, the chief of EMS, who opined that African-American employees were treated less favorably than Caucasian employees at the VA.  Crain supported her opinion by noting examples of Caucasian females complaining about harassment and the harasser was fired, but when Crain, an African-American, complained about being harassed, she was told to lock her office door and her harasser was not fired.  (Filing No. 61-2 at 3.)  Crain also noted an example of an African-American male who was terminated after being accused of throwing an IV pole at a Caucasian female lab technician.  There had been no prior complaints concerning the African-American male, and there were no witnesses to the alleged incident.  Crain believed there was insufficient evidence to justify the African-American male's termination.  *Id.* at 5.

Hatcher argues that he had complained about being harassed for several months, yet no action was taken against his harassers.  Instead, he was "terminated because of a comment he made while complaining of harassment."  (Filing No. 60 at 28.)  After complaining of harassment to Crain, the initial termination was rescinded, and Hatcher asserts that he engaged in no misconduct after the termination was rescinded.  However, in December 2014, Caucasian female employees complained that Hatcher made them feel uncomfortable.  No specific examples or evidence were produced of what Hatcher had done to make them feel uncomfortable.  Approximately three weeks later, Hatcher was terminated again for the same reasons asserted in October 2014.  Hatcher argues the real reason he was terminated is because he is an African-American male who was complained about by Caucasian females.

The Secretary asserts that Hatcher was not meeting the VA's legitimate employment expectations because he slept while on the job and made a threatening statement against a work supervisor. The Secretary argues that these two facts also provide a legitimate, non-discriminatory basis for terminating Hatcher. The Secretary argues that Hatcher has provided no evidence to show that these reasons for terminating him are a pretext for discrimination. The Secretary also notes that Hatcher failed to identify any similarly situated employee outside of his protected class who was treated more favorably. Regarding Crain's examples of alleged race discrimination, the Secretary asserts that those examples from Crain are not relevant to Hatcher's discrimination claim in this case and, in any event, Crain testified that she did not believe Hatcher was discriminated against in this situation. (Filing No. 51-3 at 93.)

The Secretary further argues that the fact Hatcher's termination was rescinded in November 2014, but then he was terminated again in January 2015 for the same reasons, does not show discrimination or pretext. Rather, the VA provided a legitimate explanation for this— Hatcher's October 2014 termination was rescinded to allow for an investigation into his allegations of harassment. (Filing No. 51-1 at 3.) The rescission did not mean that the reasons provided for terminating Hatcher the first time were not valid. The January 2015 termination occurred following investigation into the harassment allegations, based on the same reasons that were still legitimate for ending Hatcher's employment. (Filing No. 51-2 at 16–17.)

A review of the evidence as a whole shows that Hatcher was terminated because he did not qualify for continued employment beyond the probationary period based on his threatening statement and the sleeping incident. This is discussed in more detail in the section above addressing the retaliation claim.

Hatcher has not provided evidence that creates a dispute as to whether these two reasons for his termination were a pretext for discrimination. Hatcher points to Caucasian female employees complaining in December 2014 that he made them feel uncomfortable. Three weeks after this complaint, after the VA had undertaken an investigation into Hatcher's harassment complaint, the director of the Hospital issued the termination letter at the end of Hatcher's probationary period. When the time came to make a decision whether Hatcher's employment should continue beyond the probationary period, it was determined that termination was appropriate because the reasons for the October 2014 termination were still valid. The designated evidence indicates that Hatcher was terminated because his probationary period was ending and he had engaged in serious misconduct, not because Caucasian females complained about an African-American male three weeks earlier and not because of Hatcher's race. Hatcher's race discrimination claim is not supported by the evidence; therefore, summary judgment is **granted** on this claim.

**D.**     <u>**Racial Harassment Claim**</u>

To support a Title VII racial harassment claim, a plaintiff must provide evidence that (1) he was subjected to unwelcome harassment, (2) the harassment was based on his race, (3) the harassment was sufficiently severe or pervasive as to alter the conditions of his employment and create a hostile or abusive atmosphere, and (4) there is a basis for employer liability. *Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.*, 804 F.3d 826, 833–34 (7th Cir. 2015).

Hatcher contends that he was racially harassed by a supervisor and that supervisor's work leader. He argues the harassing conduct was unwelcomed as evidenced by his complaints on several occasions to work leaders, supervisors, the assistant chief, and the chief of EMS. Hatcher asserts that the racially explicit and derogatory nature of the comments and name calling—"Uncle

Tom," "Nigger," and "Uncle Tom Nigger"—used on a daily basis for a period of months easily satisfies the requirement that the harassment was based on race. He points out that these terms are historically the most offensive derogatory terms used to refer to African-Americans.

As evidence that the harassment was severe and pervasive and altered his employment, Hatcher points to his frequent complaints to supervisors and management and the anxiety and stress that it caused him, resulting in him making a threatening comment to supervisors because the harassment was not being addressed appropriately. He contends the harassment was objectively severe and offensive; as being subjected to racial name calling on a daily basis for a number of months, resulting in more than one hundred derogatory racial slurs, is easily sufficient to be considered objectively offensive.

The Secretary responds that, while there is a racial element to the derogatory names that Hatcher was called, Hatcher provided two different reasons in his deposition why he believed that White called him these names. Hatcher testified Robertson "put White on him" after he reported Robertson's comments that Hughes was a "peckerwood" and "red neck." (Filing No. 51-6 at 52.) He then testified he was harassed due to his association with Hughes. *Id.* at 86. Thus, The Secretary argues, based on Hatcher's own speculation, White's actions were not based on Hatcher's race but rather on his reporting Robertson and his association with Hughes. The Secretary asserts that Hatcher cannot show the alleged harassment was based on race and the conduct amounted to only offensive utterances that were not sufficiently severe to be physically threatening or humiliating.

The Court disagrees, being subjected to extreme racial name calling on a daily basis for a number of months, is objectively offensive. "Given American history, [the Seventh Circuit] recognize[s] that the word 'nigger' can have a highly disturbing impact on the listener."

*Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004). The Court concludes that the designated evidence clearly supports the first two elements of a racial discrimination claim—Hatcher was subjected to unwelcome harassment, and the harassment was based on his race. The offensive comments uttered by VA employees were unambiguously racial epithets. Hatcher was called racially derogatory names on a daily basis for a number of months, and he complained about the harassment because it was unwelcomed. Moreover, the VA's own EEO concluded as much (Filing No. 51-15 at 5 (Medley concluded, "I would be inclined to agree that [Hatcher] has been harassed.")).

Regarding the third and fourth elements, Hatcher must establish that the offensive racial epithets and other offensive language uttered by VA supervisors and employees were either severe or pervasive, and he must show that there is a basis for employer liability. As discussed previously, courts look at the totality of the circumstances when assessing the severity or pervasiveness of the conduct. *See Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668, 674 (7th Cir. 2004). Specifically, courts consider the frequency of the discriminatory conduct; its severity; whether it's physically threatening or humiliating; and whether it unreasonably interferes with an employees work performance. *See Russell v. Bd. of Trustees of Univ. of Illinois at Chi.*, 243 F.3d 336, 343 (7th Cir. 2001).

The Secretary asserts that Hatcher admitted, despite the allegedly harassing conduct, he was still able to do his job. *Id.* at 53 ("I did my job because I loved my job."). The Secretary argues the alleged harassment did not unreasonably interfere with Hatcher's work performance, which would defeat his racial harassment claim. The VA asserts that it timely took appropriate steps to address the harassment after Hatcher complained. The EMS supervisors instructed White to have minimal contact with Hatcher; Crain, Medley, and others conducted a fact-finding

investigation into Hatcher's allegations; the VA issued written counseling to the EMS chief, assistant chief, and supervisory staff; and the VA held communication and team building training. These steps were reasonably likely to stop the purported harassment, thereby fulfilling the VA's obligation under Title VII. The Secretary notes that the VA's efforts did not have to successfully prevent all future harassment; its efforts only had to be reasonably likely to check future harassment. *Saxton v. AT&T Co.*, 10 F.3d 526, 536 (7th Cir. 1993).

Regarding the fourth element of a racial harassment claim, the Secretary asserts there is no basis for employer liability because if he was unsatisfied with the response from his supervisors, Hatcher could have used other procedures to seek relief—such as contacting an EEO counselor, a union representative, or the Office of Inspector General—but he failed to do so.

In establishing employer liability, notice or knowledge of the harassment is a prerequisite for liability. *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1035 (7th Cir. 1998). In determining whether an employer received notice, courts will look at whether a complainant informed a department head or someone that he or she reasonably believed was authorized to receive and respond to a complaint of harassment. *Id.* Hatcher asserts that his employer is liable as they were negligent in discovering or remedying harassment, and the classic reasonable remedial action is a prompt investigation. Hatcher started complaining to Hughes, his supervisor, about the harassment in August 2014. Yet, no investigation was conducted. Hatcher then complained to Clark, the Assistant Chief of EMS, in September 2014. Again, no investigation was conducted. Clark reported the allegations of harassment to Crain, the Chief, in October 2014, yet still no investigation was conducted. All the while, the harassment continued to occur. Only after three months of Hatcher's complaining did the VA finally start an investigation, and the late investigation resulted in Hatcher's first termination being rescinded and EMS management,

including Crain and Clark, being given written counseling for their failures to investigate. Hatcher notes that there is no evidence that White, the primary harasser, was ever disciplined for his harassment. He argues the VA was clearly negligent in remedying the harassment because of the lack of a timely investigation and corrective action.

The Court determines that there are factual issues that must be resolved by the trier of fact, which precludes entry of summary judgment. Here, there is evidence of complaints of harassment for nearly three months before any real investigation was conducted. All the while, Hatcher was constantly subjected to the unabated harassment. During the November 2014 termination meeting, Hatcher complained directly to Chief Crain, and finally an investigation was initiated. However, at this point, Hatcher already had been subjected to numerous racial attacks over a period of months.

In considering the evidence in the light most favorable to the non-moving party, there is evidence that the harassment was so bad that it drove Hatcher to state to three supervisors that he would kill White if they were on the street. This threatening statement came after numerous complaints already had been lodged with supervisors. While Hatcher testified that he did his job because he loved his job, immediately before saying this, he testified that he was verbally harassed and excessively monitored "[e]very day. All day. I hated coming to work. Every day." (Filing No. 51-6 at 53.) While Hatcher had other avenues for complaining about harassment, the VA's anti-harassment policy specifically directed him to lodge harassment complaints with his immediate supervisor, which he did. (Filing No. 61-5 at 3.)

Each party has designated evidence that supports their position concerning whether the harassment was sufficiently severe or pervasive as to alter the conditions of Hatcher's employment and as to whether the VA was negligent in its response to the complaints of harassment thereby

establishing a basis for employer liability. These issues are not appropriately resolved on summary judgment and must be decided by the trier of fact. Therefore, the Court **denies** the summary judgment motion on the racial harassment claim.

### IV.   CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment (Filing No. 51) is **GRANTED in part and DENIED in part**. Summary judgment is **granted** on the claims of sexual harassment, race discrimination, and retaliation, and these claims are **dismissed**. Summary judgment is **denied** on the claim of racial harassment, and this claim may proceed to trial.

**SO ORDERED.**

Date:  9/4/2018

_Tanya Walton Pratt_

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Gregory A. Stowers
STOWERS & WEDDLE PC
gstowers@stowersandweddle.com

Amber K. Boyd
AMBER BOYD, ATTORNEY AT LAW
amber@amberboydlaw.com

Rachana Nagin Fischer
UNITED STATES ATTORNEY'S OFFICE
rachana.fischer@usdoj.gov

Gina M. Shields
UNITED STATES ATTORNEY'S OFFICE
Gina.Shields@usdoj.gov